HUNTER *v.* JOHNSTON.

5-1015                                                      294 S. W. 2d 49

Opinion delivered October 15, 1956.

*Don Steel,* for appellant.

*Nabors Shaw,* for appellee.

PAUL WARD, Associate Justice.    Mrs. Lilly Davis Hunter died in 1953, leaving as her only heirs one daughter and two sons — William, Helen and Percy.    Found among her papers were two notes signed by Percy and his wife, Juanita.    One for $2,000 and one for [a balance of] $500.    For the purposes of this opinion it may be stated that appellants admit liability on the notes and also admit they used the borrowed money to help purchase and improve a homestead in Polk County.

This suit was instituted in chancery court by Helen and William against Percy and his wife to recover judgment for two-thirds of the amount due on the notes, and to impress a lien therefor on the homestead.    The chancellor granted the relief prayed for, and appellants here seek a reversal on two grounds, viz: (a) The chancery court had no jurisdiction and (b) the evidence does not justify the granting of a lien.    We disagree with appellants on the first point but agree with them on the other point.

(a) Although we might agree that the motion to transfer to circuit, based on the original complaint, was proper, yet, from a practical standpoint it would be of no benefit to appellants for us to so hold at this time, and it would only result in a loss of time and money. The original complaint, in our opinion states no ground for equitable relief, but later an amendment to the complaint was filed which, in the absence of further objections, justified the chancellor in permitting the parties to fully develop the matter of a lien.

(b) We conclude however that it was error for the trial court to decree a lien on the homestead in favor of appellees.

The complaint, in substance, alleges that the $2,000 was used by Percy to purchase the homestead and that the $500 was used to improve it. The amended complaint alleges that the deceased advanced the $2,000 to appellants ". . . with the understanding and relying upon the representations made by the defendants to Mrs. Lilly Davis Hunter that as soon as the defendants sold their home in Florida they would repay her the amount she had advanced on the purchase price of these lands . . ."; and "that . . . in 1951 the defendants sold their Florida property but failed to repay the $2,000 . . ."

Appellees were unable to offer any direct evidence of an oral or written agreement whereby the deceased was to have a lien on either the property in Polk County or the property in Florida. William did say that his mother told him "she let him [Percy] have the money for the purchase" of the Polk County property. Percy also gave this testimony:

"Q. What did these two defendants do to defraud your mother?

A. The only thing is what she said. They come up there and borrowed the money with the understanding they were to pay when they sold the property in Florida, and the property had been sold."

\* \* \*

"Q. But she never did indicate to you that the Polk County land was security for that indebtedness, did she?

A. No, sir, she did not."

Helen's testimony on this point was:

"Q. Do you recall, Mrs. Johnston, when your mother loaned your brother Percy the $3,000?

A. No, sir, I did not know a thing about it for two years afterwards."

Perhaps the most significant evidence offered by appellees regarding the Florida property was the introduction of a letter written by the deceased, dated October 13, 1953, in which, among other things she states: "You said you would sell your Florida home and pay me . . . You said you would pay me the ins. just like the loan had and that you would sell your Florida home and pay me back in a short time." Two things should be noted regarding this letter. One is that it fails to state at what time appellant made the alleged promise, and, too, it appears likely the letter was never sent to appellants. They say they never received it, and William says "I found it in her belongings," referring to his mother.

On the other hand, Percy and his wife both state positively that they merely borrowed the money from Percy's mother, and that nothing whatever was said at that time about the Florida property or about her having a lien on the Polk County property. Moreover, their version of what took place appears reasonable. Percy, a career air force pilot, retired in 1947, and in the meantime had purchased a home in Florida. At one time while he and his wife were stationed at Fort Worth his mother visited him. On occasions Percy's mother expressed the hope they would make their home near her in Polk County. In 1950 they visited Mrs. Hunter at her home in Polk County and Percy told her he had found a place in that county which suited them but did not have sufficient money to buy it. Mrs. Hunter thereupon volunteered to loan them some money to help buy the place, and they accepted the loan. They say Mrs. Hunter did not even want a note, but they insisted, and the notes are in the handwriting of Percy's wife. No due date is shown on the notes. Within seven months after appellants bought the home in Polk County, the house and furniture burned. Thereupon Percy's wife went to Florida and sold their home for $1,217.63 [their equity], and they used this money to repair and refurnish their home in Polk County. They do not deny owing the notes.

Under this factual situation appellees are not entitled to have a lien impressed on appellants' home in Polk County. There is no evidence that Percy and his

wife agreed to give Mrs. Hunter a lien, or that they tricked or defrauded her into making the loan, or that she expected any security for the advancements other than the notes and their promise to repay.

Generally speaking, before equity will create or impress a lien in a situation similar to the one here presented, either it must appear there was some agreement to that effect, or there must be a showing of deceit or fraud. The first alternative is recognized in 53 C. J. S. at page 840, where it is stated: "An equitable lien may arise from an express contract whereby a party promises to transfer, or indicates an intent to charge or appropriate, particular property as security for an obligation. No special form of contract is essential, provided the intent of the parties to create a lien is clearly expressed." The second alternative is treated in the same volume at page 844. After stating that an equitable lien may arise independently of any express agreement, based on considerations of right and justice and on an obligation or duty to be enforced, it is stated: "However, the tendency is to limit rather than extend the doctrine of constructive liens, and, in order that such a lien may be claimed, either the aid of a court of equity must be requisite to the owner so that he can be compelled to do equity or there must be some element of fraud in the matter as a ground of equitable relief."

In this case the evidence falls short of establishing either an agreement that the deceased was to have a lien on the land, or that she was induced to make the loan by deception or fraud. It shows merely a voluntary loan of money.

Part of the money loaned by the deceased was used by appellants to make improvements on the land. Under facts much more favorable to appellees than obtain here, we held in *Butterfield* v. *Butterfield,* 79 Ark. 164, 95 S. W. 146, that no lien was created.

Neither did the loan of money for part purchase price of the land create a lien in favor of the lender under the facts in this case. Frequently the situation suggesting an

equitable lien is akin to that indicating a resulting trust. Both were discussed, on the same factual basis, in *Travis* v. *Neal*, 199 Ark. 236, 134 S. W. 2d 515 in language appropriate here. Mrs. Travis, who had paid for land which her husband and a Mr. Davis had purchased, sought to have a resulting trust or a lien declared. As to the former the court, said: "No elements of a trust appear under the conditions testified to by the parties. There was no mistake, no unconscionable conduct that by any stretching of the imagination could be treated or considered as a fraud. There was no abuse of confidence or of the relations of the parties one to another." In denying a lien it was said: "On the other hand we find no evidence that would warrant the court in declaring a lien on this property. There was a lien on the property in favor of Hubbard, and Mrs. Travis might well have been the beneficiary of that lien had she desired to claim it against the land at the time she now insists she furnished the money to pay the notes. She could have had Mr. Hubbard assign to her the notes, contract and mortgages, and since she was a stranger to the contract, in no sense a party to it, she could have enforced whatever lien Hubbard had against the land. She elected not to do that and, of course, in the payment for this property, according to her own testimony, she was a volunteer when she paid over the money."

Accordingly, the cause is reversed and remanded with directions to cancel the lien, but in all other respects the decree of the trial court is affirmed.